1

2

3

4                IN THE UNITED STATES DISTRICT COURT

5

6            FOR THE NORTHERN DISTRICT OF CALIFORNIA

7                                      No. C 07-0371 CW

JANICE KENNEDY,

8                                      ORDER GRANTING
          Plaintiff,                   PLAINTIFF'S MOTION
9                                      FOR CLASS
     v.                                CERTIFICATION,
10                                     APPOINTMENT OF CLASS
JACKSON NATIONAL LIFE INSURANCE        REPRESENTATIVE AND
11 COMPANY,                            CLASS COUNSEL;
                                       GRANTING DEFENDANT'S
12        Defendant.                   MOTION TO FILE A
   _____/   SURREPLY; GRANTING
13                                     IN PART AND DENYING
                                       IN PART DEFENDANT'S
14                                     MOTION TO DECIDE
                                       CLASS CERTIFICATION
15                                     MOTION CONCURRENTLY
                                       WITH DEFENDANT'S
16                                     MOTIONS TO STRIKE
                                       AND MOTION FOR
17                                     SUMMARY JUDGMENT;
                                       AND DENYING
18                                     DEFENDANT'S MOTIONS
                                       TO STRIKE THE
19                                     REPORTS AND
                                       TESTIMONY OF STEVEN
20                                     R. GRENADIER AND
                                       JEFFREY DELLINGER
21                                     (Docket Nos. 171,
                                       201, 225, 227 and
22                                     229)

23

24      Plaintiff Janice Kennedy brings this action on behalf of

25 herself and other similarly situated individuals, alleging that

26 Defendant Jackson National Life Insurance Company engaged in

27 unlawful practices in the solicitation, offering and sale of its

28 deferred annuity products.  Plaintiff now moves for class

certification, her appointment as class representative and appointment of class counsel. Defendant opposes the motion and moves to file a surreply in support of its opposition. Plaintiff objected to evidence proffered by Defendant in support of its opposition. The class certification motion was heard on April 8, 2010. Thereafter, Defendant filed motions to strike the reports and testimony of Jeffrey K. Dellinger and Steven R. Grenadier, filed in support of Plaintiff's motion. In addition, Defendant asked that its motions to strike and summary judgment motion be decided concurrently with Plaintiff's motion for class certification. Having considered oral argument and all the papers submitted by the parties, the Court GRANTS Plaintiff's motion, GRANTS Defendant's motion to file a surreply, GRANTS in part and DENIES in part Defendant's motion for its motions to strike and motion for summary judgment to be decided concurrently with Plaintiff's motion, and DENIES Defendant's motions to strike the reports and testimony of Steven R. Grenadier and Jeffrey Dellinger.

BACKGROUND

According to Plaintiff's First Amended Complaint (1AC), Defendant is a Michigan corporation that "specializes in retirement income and savings solutions geared primarily toward pre- and post-retirees, with the majority of its products being deferred annuities." 1AC ¶ 18. Plaintiff describes an annuity as "a contract between an annuitant and an insurance company," under which "the annuitant makes an upfront lump-sum payment or a series of payments to the insurance company." 1AC ¶ 19. In return, the insurance company "agrees to make payments to the annuitant over a period of time." Id. In a deferred annuity arrangement, the

United States District Court
For the Northern District of California

annuitant agrees to forgo payments for a given period of time, during which earnings accrue.  However, until the date the annuity matures and the insurance company begins payment, the annuitant may not withdraw funds without incurring a "surrender charge."  1AC ¶ 22.  According to Plaintiff, although this charge diminishes as the maturity date approaches, the penalty may start as high as nine to ten percent.

In July, 2002, Plaintiff received an advertisement through the United States mail for a "Senior Financial Survivor Workshop."  1AC ¶ 43.  She avers that the workshop was presented by Peter Spafford, "a licensed and appointed Jackson National agent."  1AC ¶ 43.  At the workshop, Mr. Spafford provided Plaintiff and other senior citizens with brochures and additional written materials. Thereafter, Mr. Spafford visited Plaintiff in her home to promote Defendant's products.  In January, 2004, Plaintiff purchased Defendant's "JNL Bonus Max Two" deferred annuity for $100,000.

Apparently "in need of access" to her funds, Plaintiff surrendered her annuity in 2005.  1AC ¶ 47.  As a result, she "incurred a substantial surrender penalty and other fees . . . ." 1AC ¶ 47.

Plaintiff alleges that Defendant does not adequately disclose that its "deferred annuities are worth substantially less than the purchaser's original invested funds;" that it pays commissions that "adversely impact the performance of the annuities;" that its bonuses are illusory because it "recoups those bonuses through higher surrender charges, longer surrender periods, and reduced interest charges, caps or participation rates;" and that it imposes "fees and loads through indecipherable product design and

3

United States District Court
For the Northern District of California

mechanics."  1AC ¶ 38(a)-(b), (j)-(k).  She claims that Defendant misleads senior citizens[1] through its "stringent control . . . over marketing materials and sales presentations by its Affiliated Agents."  1AC ¶ 41.

Plaintiff moves the Court to certify two classes to prosecute claims for violations of the Racketeer Influenced and Corrupt Organizations (RICO) Act, 19 U.S.C. § 1962(c)-(d); financial elder abuse, Cal. Welf. & Inst. Code §§ 15600, et seq.; violations of the California Unfair Competition Law (UCL), Cal. Bus. & Prof. Code §§ 17200, et seq.; and violations of California false advertising laws, Cal. Bus. & Prof. Code §§ 17500, et seq.  The nationwide class she proposes to prosecute the RICO claim is comprised of:

> All persons nationwide who purchased one or more Jackson National Life Insurance Company deferred annuities (excluding variable annuities) -- from October 24, 2002, to the present -- whom were age 65 or older at the time of purchase.

Mot. at 1.  To prosecute her financial elder abuse, UCL and false advertising claims, Plaintiff requests certification of a class comprised of:

> All California residents who purchased one or more Jackson National Life Insurance Company deferred annuities (excluding variable annuities) -- from October 24, 2002, to the present -- whom were age 65 or older at the time of purchase.

Id.  Plaintiff does not seek certification of classes to prosecute her state law claims for fraudulent concealment, fraudulent inducement and misrepresentation, and common law fraud.

LEGAL STANDARD

Plaintiffs seeking to represent a class must satisfy the

---

[1] As used by Plaintiff and the Court, "senior citizens" refers to individuals sixty-five years of age or older.

4

threshold requirements of Rule 23(a) as well as the requirements for certification under one of the subsections of Rule 23(b).  Rule 23(a) provides that a case is appropriate for certification as a class action if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).

Rule 23(b) further provides that a case may be certified as a class action only if one of the following is true:

> (1) prosecuting separate actions by or against individual class members would create a risk of:

>> (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

>> (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

> (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include:

>> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

**United States District Court**
For the Northern District of California

1
2
       (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

3
4
       (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

5
6
       (D) the likely difficulties in managing a class action.

7
Fed. R. Civ. P. 23(b).

8
    Plaintiffs seeking class certification bear the burden of

9
demonstrating that each element of Rule 23 is satisfied, and a

10
district court may certify a class only if it determines that the

11
plaintiffs have borne their burden. Gen. Tel. Co. v. Falcon, 457

12
U.S. 147, 158-61 (1982); Doninger v. Pac. Nw. Bell, Inc., 564 F.2d

13
1304, 1308 (9th Cir. 1977). The court must conduct a "rigorous

14
analysis," which may entail "looking behind the pleadings to issues

15
overlapping with the merits of the underlying claims." Dukes v.

16
Wal-Mart Stores, Inc., 603 F.3d 571, 591 (9th Cir. 2010). In doing

17
so, however, the court must not consider "any portion of the merits

18
of a claim that do not overlap with the Rule 23 requirements." Id.

19
at 594. To satisfy itself that class certification is proper, the

20
court may consider material beyond the pleadings and require

21
supplemental evidentiary submissions by the parties. Id. at 589

22
(quoting Blackie v. Barrack, 524 F.2d 891, 901 n.17 (9th Cir.

23
1975)). Ultimately, it is in the district court's discretion

24
whether a class should be certified. Dukes, 603 F.3d at 579.

DISCUSSION

25
I. Rule 23(a) Requirements

26
    A.   Numerosity

27
    Plaintiff asserts that there would be a large number of people

28

in the nationwide class and a smaller but substantial number in the California class.  Defendant does not contest Plaintiff's figures. The Court therefore finds that Plaintiff satisfies the numerosity requirement.

B.   Commonality

Rule 23 contains two related commonality provisions.  Rule 23(a)(2) requires that there be "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Rule 23(b)(3), in turn, requires that such common questions predominate over individual ones.

The Ninth Circuit has explained that Rule 23(a)(2) does not preclude class certification if fewer than all questions of law or fact are common to the class:

> The commonality preconditions of Rule 23(a)(2) are less rigorous than the companion requirements of Rule 23(b)(3).  Indeed, Rule 23(a)(2) has been construed permissively.  All questions of fact and law need not be common to satisfy the rule.  The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class.

Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998).

Rule 23(b)(3), in contrast, requires not just that some common questions exist, but that those common questions _predominate_.  In _Hanlon_, the Ninth Circuit discussed the relationship between Rule 23(a)(2) and Rule 23(b)(3):

> The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.  This analysis presumes that the existence of common issues of fact or law have been established pursuant to Rule 23(a)(2); thus, the presence of commonality alone is not sufficient to fulfill Rule 23(b)(3).  In contrast to Rule 23(a)(2), Rule 23(b)(3) focuses on the relationship between the common and individual issues.  When common questions present a significant aspect of the case and they can be

United States District Court
For the Northern District of California

resolved for all members of the class in a single
adjudication, there is clear justification for handling
the dispute on a representative rather than on an
individual basis.

Id. at 1022 (citations and internal quotation marks omitted).

Plaintiff asserts that this action involves a common set of
facts and legal theories concerning Defendant's alleged material
misrepresentations and omissions in marketing to senior citizens.
Defendant does not contend otherwise and directs most of its
argument to the Rule 23(b)(3) predominance inquiry, which is
addressed below.  The putative class members share a sufficiently
common experience, in that they are all senior citizens who were
exposed to Defendant's marketing and thereafter purchased
Defendant's annuities.  Further, Defendant's alleged liability for
each of the class members' purported harm is predicated on the same
legal theories.  Plaintiff therefore satisfies the commonality
requirement.

C.   Typicality

Rule 23(a)(3)'s typicality requirement provides that a "class
representative must be part of the class and possess the same
interest and suffer the same injury as the class members." Falcon,
457 U.S. at 156 (quoting E. Tex. Motor Freight Sys., Inc. v.
Rodriguez, 431 U.S. 395, 403 (1977)) (internal quotation marks
omitted).  The purpose of the requirement is "to assure that the
interest of the named representative aligns with the interests of
the class." Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th
Cir. 1992).  Rule 23(a)(3) is satisfied where the named plaintiffs
have the same or similar injury as the unnamed class members, the
action is based on conduct which is not unique to the named

8

plaintiffs, and other class members have been injured by the same course of conduct.  Id.  Class certification is inappropriate, however, "where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation."  Id. (quoting Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176, 180 (2d Cir. 1990), cert. denied, 498 U.S. 1025 (1991)).

Plaintiff, at the age of sixty-five, purchased one of Defendant's annuities after attending a presentation by and receiving materials from one of Defendant's representatives.  She asserts injury based on misrepresentations and omissions in Defendant's marketing.  Defendant does not challenge Plaintiff's argument that her interests align with those of individuals in the classes for which she seeks certification.  Nor does it raise unique issues pertaining to Plaintiff.  Accordingly, Plaintiff satisfies the typicality requirement.

D.   Adequacy

Rule 23(a)(4)'s adequacy requirement ensures that absent class members are afforded competent representation before entry of a judgment which binds them.  Hanlon, 150 F.3d at 1020.  "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  Id.

In her class certification motion, Plaintiff contends that Defendant's fraudulent scheme is based on its misrepresentations concerning its "bonus" annuities and the non-disclosure of the

9

effects of its agents' commissions and the market value/excess interest adjustment feature (MVA/EIA)[2].  Defendant maintains that, by not pursuing certification on the multiple theories of liability asserted in her complaint, Plaintiff is engaging in "claim splitting" and is therefore inadequate to represent the class.  <u>See City of San Jose v. Superior Court</u>, 12 Cal. 3d 447, 464 (1974).

Although so-called claim splitting could render a plaintiff inadequate to represent a class, the concerns raised by Defendant do not apply here.  Defendant contends that Plaintiff is inadequate because she does not seek recovery based on the unsuitability of the deferred annuities for class members, "flexible premium Contracts," "fees for 'electing early annuitization,'" and "'surrender charges.'"  Surreply at 2 (quoting Pl.'s Compl.).  However, after Plaintiff conducted discovery on these matters, she apparently concluded that the theories she now asserts afford the greatest likelihood of success on behalf of the class.  Moreover, as Defendant contends in its opposition brief, a claim based on the suitability of its annuities could require an individualized inquiry into each class member's circumstances.  Defendant cannot claim that Plaintiff is inadequate because she declines to assert a theory that could unravel the putative class.

Plaintiff requests appointment of Ingrid M. Evans, of Waters Kraus & Paul, and Howard D. Finkelstein and Mark L. Knutson, of Finkelstein & Krinsk LLP, as class counsel.  Having reviewed the papers submitted, the Court finds Plaintiff and her counsel

_____

[2] Plaintiff refers to this feature as a "market value adjustment," whereas Defendant terms it an "excess interest adjustment."  The Court accordingly refers to it as the MVA/EIA.

United States District Court
For the Northern District of California

1    adequate to represent the interests of the class.

2    II.   Rule 23(b) Requirements

3          A.   Predominance

4          "The predominance inquiry of Rule 23(b)(3) asks whether

5    proposed classes are sufficiently cohesive to warrant adjudication

6    by representation.  The focus is on the relationship between the

7    common and individual issues." In re Wells Fargo Home Mortgage

8    Overtime Pay Litig., 571 F.3d 953, 957 (9th Cir. 2009) (internal

9    quotation marks and citations omitted).  "'When common questions

10   present a significant aspect of the case and they can be resolved

11   for all members of the class in a single adjudication, there is

12   clear justification for handling the dispute on a representative

13   rather than on an individual basis.'" Hanlon, 150 F.3d at 1022

14   (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane,

15   Federal Practice & Procedure § 1777 (2d ed. 1986)).  "Rule 23(b)(3)

16   requires a district court to formulate 'some prediction as to how

17   specific issues will play out in order to determine whether common

18   or individual issues predominate . . . .'" Dukes, 603 F.3d at 593

19   (quoting In re New Motor Vehicles Canadian Export Antitrust Litig.,

20   522 F.3d 6, 20 (1st Cir. 2008)).

21         Fraud is an element of each of the claims for which Plaintiff

22   seeks to certify classes.  Class certification of a fraud-based

23   claim may be appropriate if the plaintiffs allege that an entire

24   class of people has been defrauded by a common course of conduct.

25   In In re First Alliance Mortgage Co., the Ninth Circuit upheld

26   class certification where a lender employed a

27   "centrally-orchestrated scheme to mislead borrowers through a

28   standardized protocol the sales agents were carefully trained to

11

perform, which resulted in a large class of borrowers entering into loan agreements they would not have entered had they known the true terms." 471 F.3d 977, 991 (9th Cir. 2006).  The court distinguished its "common course of conduct" approach from that adopted by other circuits, which instead highlights "the importance of uniformity among misrepresentations made to class members in order to establish that element of fraud on a class-wide basis." Id. at 990 n.3 (distinguishing Moore v. PaineWebber, Inc., 306 F.3d 1247, 1255 (2d Cir. 2002) and In re LifeUSA Holding, Inc., 242 F.3d 136, 138-40 (3d Cir. 2001)).

Plaintiff, unlike the plaintiffs in In re First American, does not present evidence that Defendant deploys a standardized sales pitch through its sales agents.[3]  Nor does she assert that Defendant's agents receive uniform training or that they must adhere to a script when making sales presentations.  Instead, Plaintiff's theory is that, irrespective of how its agents market

---

[3] Plaintiff maintains that Defendant exerts adequate authority over the marketing of its products to ensure that each putative class member is exposed to a standardized sales pitch.  However, the evidence proffered by Plaintiff does not demonstrate that Defendant's products are marketed uniformly.  Plaintiff points to the requirement that each representative sign a client's annuity application, in which he or she certifies that

> I have fully explained the Contract to the client, including contract restrictions and charges; I believe this transaction is suitable given the client's financial situation and needs; I have complied with requirements for disclosures . . . .

Evans Decl., Ex. R at JNLK000002.  However, this statement simply suggests that the representative made some required disclosures; it does not, as Plaintiff asserts, demonstrate that putative class members received a uniform set of marketing materials.  Furthermore, despite substantial discovery, Plaintiff does not show how the above-mentioned disclosure requirements ensure a standardized sales pitch.

12

its products, Defendant misrepresents the benefits of its "bonus" annuities and fails to disclose the effects of commissions paid to its agents and the MVA/EIA feature applied to some of its annuities. In Plaintiff's view, Defendant neither provides nor requires its agents to provide adequate disclosure concerning these three issues. This alleged deception, Plaintiff asserts, constitutes the type of common course of conduct held sufficient by In re First Alliance. To satisfy the requirements of Rule 23(b)(3) under such a theory, Plaintiff must show, at the least, the predominance of common questions of fact concerning whether Defendant deceives senior citizens as to these three issues.

Defendant's "bonus" annuities have an initial crediting rate, which provides a higher rate of return during the first year as compared to subsequent years. Because the crediting rate applied after the initial rate expires is lower, Plaintiff maintains the term "bonus" is misleading because these annuities give purchasers a "false sense of benefit or policy enhancement," when they are in fact "effectively the same as non-bonus products." Reply at 5; see also Dellinger Decl. ¶ 48. Defendant contends that individual questions of fact would predominate on the bonus issue because there are variations in the amount of disclosure provided to its prospective customers. For instance, Defendant maintains that it explains the teaser interest rate for its "bonus" annuities on the cover of the contracts for such annuities. Defendant also asserts that this explanation varies from contract to contract and has changed over time. Further, Defendant proffers the declarations of several of its sales agents, some of whom state that they explain the bonus interest rate to their customers. Even if this evidence

13

**United States District Court**
For the Northern District of California

were credited, Plaintiff's theory concerns Defendant's use of the word "bonus" in connection with these annuities.  Her complaint is that, irrespective of any disclosure, describing these annuities as including a "bonus" is misleading.

Plaintiff also alleges that Defendant does not adequately disclose the amount of its agents' commissions and the effect they have on an annuity's performance.  Defendant, however, cites declarations by its agents, which indicate that some of them -- without any direction from Defendant -- disclosed their commissions.  These instances of disclosure do not defeat certification based on Plaintiff's theory of fraud.  As noted above, Plaintiff maintains that Defendant does not provide adequate disclosure, either on its own or through its agents, of the effect the payment of commissions may have on an annuitant's rate of return.  Although the declarations show that some agents informed clients of their commission arrangements with Defendant, they do not suggest that the agents discussed anything with regard to their the commissions' effects.  Moreover, the independent, voluntary actions taken by a handful of Defendant's agents do not defeat the predominance of common questions of fact concerning whether Defendant adequately disclosed this information.

Finally, Plaintiff contends that Defendant fails to provide adequate disclosure concerning the effects of the MVA/EIA, which, like the "bonus" interest rate, applies to only some of Defendant's annuities.[4]  Defendant does not dispute the existence of the

---

[4] At the hearing, Plaintiff seemed to assert that all of Defendant's annuities have an MVA/EIA.  However, Plaintiff concedes
(continued...)

MVA/EIA or that it can affect an annuitant's return on investment. However, Defendant maintains that it discloses sufficient information, citing Plaintiff's annuity contract, which provides that the MVA/EIA is an "adjustment applied, with certain exceptions, to amounts withdrawn from the Contract, prior to the end of the Withdrawal Charge period." App. to Opp'n, Ex. 42 at JNLK000123. Plaintiff argues that this description does not adequately inform Defendant's customers of the effect of the MVA/EIA. Because Defendant does not offer evidence that such disclosure materially differs on an individual basis, Plaintiff raises a common question of whether Defendant fails to provide adequate information concerning the effect of this feature to its customers.

Plaintiff demonstrates the predominance of common questions of fact concerning the alleged misleading use of the word "bonus" and non-disclosures of the effects of Defendant's commission arrangements and the MVA/EIA. However, even though these alleged deceptive practices could be proven on a class-wide basis, Plaintiff must likewise satisfy the predominance requirement with respect to the remaining elements of her claims.

1.   RICO Claim

"The elements of a civil RICO claim are as follows: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as predicate acts) (5) causing injury

---

[4](...continued)
in her papers that "many," but not all, of the annuities have such a feature. Mot. at 9; Reply at 6. Indeed, even in annuities that have an MVA/EIA, the "hidden bias" of which Plaintiff complains is not uniform. See Dellinger Decl. at 19 n.65.

to plaintiff's business or property." <u>Living Designs, Inc. v. E.I.</u>
<u>Dupont de Nemours & Co.</u>, 431 F.3d 353, 361 (9th Cir. 2005)
(citation and internal quotation marks omitted).  "Causation lies
at the heart of a civil RICO claim." <u>Poulos v. Caesars World,</u>
<u>Inc.</u>, 379 F.3d 654, 664 (9th Cir. 2004) (citations omitted).
"Lumping claims together in a class action does not diminish or
dilute this requirement." <u>Id.</u>  To maintain a civil RICO claim
based on mail fraud, a plaintiff must show that the defendant's
"alleged misconduct proximately caused the injury." <u>Id.</u>

Although reliance is not a component of a RICO claim, it
"provides a key causal link between" a defendant's alleged
misrepresentations and omissions and the class members' injury.
<u>Id.</u> at 666.

a.   Causation

Under Plaintiff's theory, class members were harmed when they
purchased annuities "that were worth substantially less than what
[Defendant] represented." Mot. at 21.  Thus, to show causation,
Plaintiff must prove that, because Defendant misrepresented or
failed to disclose facts, class members purchased the annuities to
their detriment.

The parties dispute whether common questions predominate on
this issue.  Plaintiff asserts that she can show causation in two
ways.  First, she contends that all putative class members signed
applications and received acknowledgment and contract forms that
did not cure Defendant's misrepresentation or non-disclosure of the
"bonus" crediting rate, agents' commissions and the MVA/EIA.  Thus,
she maintains, the applications constitute direct evidence of
causation.  Second, she argues that reliance and, therefore,

16

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

causation can be presumed because Defendant's alleged misrepresentations and omissions "touch on core characteristics" of its annuity products.  Reply at 11.  Defendant responds that causation requires an analysis of each class member's state of mind, thereby precluding Plaintiff from vindicating her claims through predominantly common proof.

To rely on a theory of causation based on Defendant's forms, Plaintiff must show that each class member received materially similar documents.  However, Defendant provides evidence to the contrary, showing that its contracts vary from annuity to annuity.  For instance, language in its contracts explaining the "bonus" can vary.  Compare Def.'s Appx., Ex. 42, at JNLK0000119 with Def.'s Appx., Ex. 46, at JNLK0008053.  Plaintiff does not respond to Defendant's proffer of this evidence.  Thus, a theory of causation resting on Defendant's written materials would require an individualized inquiry into which documents each class member received.[5]

Alternatively, Plaintiff argues that causation can be shown through circumstantial evidence.  She asserts that a jury could reasonably infer reliance based on Defendant's uniform use of the term "bonus," its failure to disclose material information and class members' purchase of annuities that are "high cost, illiquid and poorly-performing."  Mot. at 20.  She maintains that no

_____

[5] This is unlike the showing required concerning the existence of the misrepresentations and omissions themselves because Plaintiff relies on Defendant's consistent use of the word "bonus" to refer to some annuities and the absolute non-disclosure of the effects of commissions and the MVA/EIA.  To satisfy predominance, Plaintiff does not refer to content that varies materially from document-to-document.

reasonable person would have purchased such an unsatisfactory investment product had Defendant disclosed the facts Plaintiff alleges it either misrepresented or failed to disclose.  In Negrete, the district court concluded that the plaintiffs adequately established that proximate causation could be shown through generalized evidence based on the use of standardized marketing materials and the "plaintiffs' allegations that class members purchased annuity products far less valuable than other comparable products or the prices paid for them . . . ."  238 F.R.D. at 492.  The court explained that this was a "'common sense' or 'logical explanation' for the behavior" of the class members and that a jury could infer that "no rational class member would purchase the annuities in question[] upon adequate disclosure of the facts, regardless of their individual circumstances . . . ."  Id. at 491 (citing Poulos, 379 F.3d at 667-68).  Such an inference, discussed with approval by the Ninth Circuit in Poulos,[6] could arise here.  Defendant allegedly misrepresented or failed to

_____

     [6] In Poulos, the Ninth Circuit observed that the district courts in Garner v. Healy, 184 F.R.D. 598 (N.D. Ill. 1999), and Peterson v. H & R Block Tax Services, Inc., 174 F.R.D. 78 (N.D. Ill. 1997), certified classes because reliance could be inferred through a "common sense" link between a defendant's alleged misrepresentations or omissions and the class members' actions. 379 F.3d at 667-68.  In Garner, the district court certified a class of consumers who purchased a substance advertised as "car wax," even though it did not contain wax.  184 F.R.D. at 602.  The court therefore concluded that "if Plaintiffs paid money for a 'wax,' but instead received a worthless 'non-wax' product, then issues of proximate cause would be relatively simple to resolve on a classwide basis."  Id.  In Peterson, the district court certified a class of consumers who purchased services for which they were ineligible.  174 F.R.D. at 80-81.  The court concluded that the "only logical explanation for such behavior is that the class members relied on [defendants'] representation that they could take advantage of [the service] by paying the requisite fee."  Id. at 85.

United States District Court
For the Northern District of California

disclose material features of its annuities.  If Plaintiff proves
that the annuities do not offer a benefit in relation to their
cost, a reasonable inference could be drawn that class members
would not have purchased them had they been fully informed about
material facts.

Defendant also relies on <u>Poulos</u>, but to argue that this case
requires an individualized inquiry into each class member's state
of mind.  <u>Poulos</u> involved allegations that the class members were
harmed by the defendant casino operators' alleged
misrepresentations concerning video poker and electronic slot
machines.  379 F.3d at 659-61.  The court concluded that causation
could not be shown on a class-wide basis because gamblers "do not
share a common universe of knowledge and expectations -- one
motivation does not 'fit all.'"  <u>Id.</u> at 665.  The court reasoned
that some gamblers "may be unconcerned with the odds of winning,
instead engaging in casual gambling as entertainment or a social
activity," whereas others may gamble based on their keen awareness
of the risk.  <u>Id.</u> at 665-66.  The court suggested that its holding
was limited to gambling, opining about the "unique nature of
gambling transactions," <u>id.</u> at 665, and stating that "to prove
proximate causation <u>in this case</u>, an individualized showing of
reliance is required," <u>id.</u> at 666 (emphasis in original).  This
case is not analogous.  Although it is true that class members may
have had different investment objectives, it is unlikely that they
would have intentionally purchased annuities with the depressed
rate of return that Plaintiff alleges, without any apparent
benefit.

From common proof on the materiality of the misrepresented or

omitted facts, a fact-finder could infer that class members
purchased Defendant's annuities based on deceptive practices.
Thus, common questions predominate as to causation for Plaintiff's
RICO claim.

<blockquote>b.    Damages</blockquote>

"The measure of civil damages under RICO is the harm caused by
the predicate acts constituting the illegal pattern." <u>Ticor Title</u>
<u>Ins. Co. v. Florida</u>, 937 F.2d 447, 451 (9th Cir. 1991).  As noted
above, Plaintiff's theory is that she and putative class members
were injured through their purchase of annuities that were worth
less than the price they paid.  Plaintiff offers separate formulas
to address damages arising from the alleged illusory bonuses and
the non-disclosure of the effects of high agent commissions.

Concerning the bonuses, Plaintiff's damages expert, Dr. Steven
R. Grenadier posits that damages would "equal the value of the
reduced future cash flows as a result of the issuer attempting to
recoup the inflated initial returns through greater future
spreads."  Grenadier Decl. ¶ 16.  Defendant does not contest the
class-wide applicability of this methodology.  Accordingly,
Plaintiff demonstrates that common questions predominate concerning
damages based on the illusory bonuses.

With regard to the harm caused by the alleged non-disclosure
of commissions, Dr. Grenadier asserts that every "dollar from an
investment that is used to pay sales commissions is a direct loss
to the investor."  Grenadier Decl. ¶ 8.  He contends that, unlike
charges assessed to compensate portfolio managers, commissions have
no effect on investment performance and, as a result, they only
serve to reduce an annuity's "net investment value."  Grenadier

Decl. ¶¶ 9 and 10.  He analogizes this decrease to the effect of up-front sales charges on load mutual funds.  With these investments, fees are deducted directly from an individual's contribution, thereby reducing the amount to which returns could accrue.  Dr. Grenadier therefore proposes a damages formula that multiplies the ratio of the sales commission found by a jury to constitute injury by the amount an annuitant invested.

Defendant complains that Dr. Grenadier fails to explain how each dollar spent on a sales commission results in a commensurate decrease in the annuity's investment value.  Defendant's expert, Dr. Craig Merrill, asserts that Dr. Grenadier's mutual fund analogy is likely inapposite.  He does not, however, go so far as to declare it unsound.  <u>See</u> Merrill Report at 8.  In response, Dr. Grenadier reasserts that "the undisputed fact that money spent on sales commissions is not spent on investment, and investment performance suffers because of this."[7]  Grenadier Supp. Decl. ¶ 2.

Dr. Grenadier's simple formula can be applied class-wide.  It is true that, unlike with load mutual funds, the annuitant's principal is not reduced by the sales commission paid to the agent.  However, Plaintiff argues that the such costs are recouped over time through indirect methods, such as imposing longer periods in which surrender charges may apply.  Plaintiff asserts that, even though the amount of an annuitant's investment does not decrease, the value of the annuity is reduced based on the terms and conditions imposed by Defendant.  Dr. Grenadier's formula addresses

_____

[7] In his supplemental declaration, Dr. Grenadier cites his expert report.  <u>See</u> Grenadier Supp. Decl. ¶ 2.  This report, which may offer additional insight into his theory, was not lodged with the Court.

United States District Court
For the Northern District of California

this alleged devaluation and can be employed on a class-wide basis. Thus, common questions predominate with respect to damages arising from the non-disclosure of commissions.

The Court notes that Plaintiff does not propose a methodology for calculating damages based on the alleged non-disclosure of the MVA/EIA's effects.  Because she demonstrates that some damages could be determined class-wide, this does not preclude class certification.

2.   UCL and False Advertising Claims

The UCL prohibits any "unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200.  It incorporates other laws and treats violations of those laws as unlawful business practices independently actionable under state law.  <u>Chabner v. United Omaha Life Ins. Co.</u>, 225 F.3d 1042, 1048 (9th Cir. 2000). Violation of almost any federal, state, or local law may serve as the basis for a UCL claim.  <u>Saunders v. Superior Ct.</u>, 27 Cal. App. 4th 832, 838-39 (1994).  In addition, a business practice may be "unfair or fraudulent in violation of the UCL even if the practice does not violate any law."  <u>Olszewski v. Scripps Health</u>, 30 Cal. 4th 798, 827 (2003).  The UCL prohibits as fraudulent conduct any activity that is "likely to deceive" members of the public. <u>Puentes v. Wells Fargo Home Mortgage, Inc.</u>, 160 Cal. App. 4th 638, 645 (2008).  "A violation of the UCL's fraud prong is also a violation of the false advertising law."  <u>Pfizer Inc. v. Superior Court</u>, 182 Cal. App. 4th 622, 630 n.4 (2010) (citations omitted).

The California Supreme Court has held, "Relief under the UCL is available without individualized proof of deception, reliance and injury."  <u>In re Tobacco II Cases</u>, 46 Cal. 4th 298, 320 (2009).

22

1   The California Court of Appeal noted in <u>Massachusetts Mutual Life</u>

2   <u>Insurance Co. v. Superior Court</u>, 97 Cal. App. 4th 1282, 1292-93

3   (2002),

> The fact that a defendant may be able to defeat the showing
> of causation as to a few individual class members does not
> transform the common question into a multitude of individual
> ones; plaintiffs satisfy their burden of showing causation
> as to each by showing materiality as to all.  Thus, it is
> sufficient for our present purposes to hold that if the
> trial court finds material misrepresentations were made to
> the class members, at least an inference of reliance would
> arise as to the entire class.

9   (internal quotation marks and citations omitted).

10      As to these claims, the parties only dispute whether causation

11  can be demonstrated through common proof.  Plaintiff satisfies her

12  burden to show that such evidence exists.  She demonstrates that

13  she could prove that Defendant uniformly misrepresented the bonus

14  annuities and failed to disclose the effects of agent commissions

15  and the MVA/EIA.  She also contends that these deceptive acts

16  involve material information, which supports, under <u>Massachusetts</u>

17  <u>Mutual</u>, an inference of reliance by the entire class.

18      Accordingly, common questions of fact predominate in the

19  claims under California's UCL and false advertising laws.

20          3.   Financial Elder Abuse

21      A defendant may be held liable for financial abuse of an elder

22  if it "[t]akes, secretes, appropriates, obtains, or retains real or

23  personal property of an elder or dependent adult for a wrongful use

24  or with intent to defraud, or both."  Cal. Welf. & Inst. Code

25  § 15610.30(a)(1).  An acquisition by a defendant of property based

26  on false statements can constitute financial elder abuse.  <u>See</u>

27  <u>Zimmer v. Nawabi</u>, 566 F. Supp. 2d 1025, 1034 (E.D. Cal. 2008).

28      Plaintiff's financial elder abuse claim is predicated on the

United States District Court
For the Northern District of California

23

same allegations discussed above.   The reasons supporting the

Court's conclusions that Plaintiff can prove liability through

class-wide evidence on those claims apply with equal force here.[8]

Accordingly, Plaintiff demonstrates that common questions

predominate over individual issues with respect to this claim.

       B.   Superiority

     The Court finds that adjudicating class members' claims in a

single action would be superior to maintaining a multiplicity of

individual actions involving similar legal and factual issues.

Although Defendant argues that class action treatment is not

superior because it believes that each class member has a claim

worth more than $75,000, it does not identify any other reason why

individual actions would be preferable.   The Court concludes that

this action satisfies Rule 23(b)(3)'s superiority requirement.

Because Plaintiff meets the requirements set forth by Rule 23, the

Court certifies her proposed classes.

III. Defendant's Motions

     Defendant filed several motions after Plaintiff's motion for

class certification was taken under submission.   Defendant asks the

Court to decide Plaintiff's class certification motion concurrently

with its motions to strike and motion for summary judgment, citing

the Ninth Circuit's recent decision in Dukes.   The Court finds it

unnecessary to decide, concurrently with Plaintiff's motion,

Defendant's motion for summary judgment.   Defendant's motions to

strike, however, are considered below.

---

    [8] The Court assumes, without deciding, that causation is a
required element of this claim.

United States District Court

For the Northern District of California

A.   Motion to Strike Report and Testimony of Dr. Grenadier

Under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), Defendant challenges the opinions of Dr. Grenadier, arguing that his report and testimony are both unreliable and irrelevant.   In particular, Defendant objects to the formula Dr. Grenadier uses to measure the injury that arises from the alleged failure to disclose agents' commissions.[9]   Defendant asserts that this methodology has no relation to the facts of this case and, as a result, is inadmissible.

Expert witness testimony is admissible if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."   Fed. R. Evid. 702; see also Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 151-52 (1999).   In assessing reliability, a court may consider the factors set out in Daubert, which are "(a) whether the theory or technique can and has been tested; (b) whether the theory or technique has been subjected to peer review and publication; (c) the known or potential rate of error for the technique; and (d) the theory or technique's general degree of acceptance in the relevant scientific community."   Boyd v. City & County of S.F., 576 F.3d 938, 945 (9th Cir. 2009) (citing Daubert, 509 U.S. at 593-94).   The "test of reliability is flexible, and Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every

---

[9] Defendant does not challenge the reliability and relevance of Dr. Grenadier's methodology to calculate damages that flow from the alleged illusory bonuses.

United States District Court
For the Northern District of California

case." <u>Kumho Tire</u>, 526 U.S. at 141 (citation and internal quotation marks omitted).

As noted above, Dr. Grenadier believes that commission "costs reduce investment value dollar for dollar" because, unlike fee charges for research or the cost of compensating qualified portfolio managers, sales commissions have no impact on performance. Grenadier Decl. ¶ 9. He claims that "voluminous literature in finance" supports his opinion, but only cites language from one book. Grenadier Decl. ¶¶ 9 and 11.

Although Dr. Grenadier offers limited justification for his theory,[10] the Court is not persuaded that his opinion is unreliable and irrelevant. Defendant does not dispute that Dr. Grenadier is an expert in his field, nor does it provide expert rebuttal testimony to suggest that his theory lacks reliability.[11] As an economics professor, Dr. Grenadier has knowledge of investments. Further, he cites supporting literature, which indicates that his theory is accepted within the economics community. Although Defendant may disagree with this formula, this does not render Dr. Grenadier's opinion unreliable. And, because his theory addresses Plaintiff's assertion that damages can be determined on a class-wide basis, his opinion is relevant to class certification. At this stage in the litigation, it is enough that Dr. Grenadier "presented scientifically reliable" and relevant evidence tending to show the predominance of common questions of fact concerning

_____

[10] As noted above, Plaintiff has not lodged Dr. Grenadier's expert report with the Court.

[11] Although Dr. Merrill challenges Dr. Grenadier's opinion, he does not state that it is incorrect. <u>See</u> Merrill Report at 8.

**United States District Court**
For the Northern District of California

1    damages.  Dukes, 603 F.3d at 603.[12]

2         Accordingly, the Court denies Defendant's motion to strike Dr.

3    Grenadier's report and testimony on how to measure damages arising

4    from the alleged failure to disclose commissions.

5         B.   Motion to Strike Report and Testimony of Jeffrey
              Dellinger

6

7         Defendant moves to strike the report and declaration of

8    Jeffrey Dellinger, asserting that it could not adequately cross-

9    examine him because he refused to answer questions about his

10   employment with Lincoln National Life Insurance Company, with which

11   he apparently has a confidentiality agreement.  Because of his

12   refusal to respond, Defendant contends that Mr. Dellinger lacks

13   credibility and trustworthiness and should be barred from

14   testifying.

15        Based on the current record, it is not evident that Mr.

16   Dellinger should be disqualified.  Although Defendant complains

17   that Mr. Dellinger was intransigent during cross-examination, it

18   did not move to compel production of his confidentiality agreement

19   or seek any determination whether the agreement in fact prevents

20   him from answering relevant questions.  The Court accordingly

21   denies Defendant's motion to strike Mr. Dellinger's report and

22

23        [12] Notably, the Dukes majority suggested, but did not decide,
     that Daubert may not have "exactly the same application at the
24   class certification stage as it does to expert testimony relevant
     at trial."  603 F.3d at 603 n.22.  Indeed, Defendant states that
25   the "bar for consideration of expert testimony at the class
     certification stage is . . . low."  Response to Pl.'s Objections at
26   1 (citing Ellis v. Costco Wholesale Corp., 240 F.R.D. 627, 636
     (N.D. Cal. 2007); see also Fisher v. Ciba Specialty Chem. Corp.,
27   238 F.R.D. 273, 279 (S.D. Ala. 2006) (stating that "the Federal
     Rules of Evidence are not stringently applied at the class
28   certification stage because of the preliminary nature of such
     proceedings").

United States District Court
For the Northern District of California

declaration.

CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiff's motion for class certification. (Docket No. 171.) The following classes are hereby certified pursuant to Fed. R. Civ. P. 23(a) and (b)(3):

> Nation-wide RICO Senior Class: All persons who purchased one or more Jackson National Life Insurance Company deferred annuities (excluding variable annuities) -- from October 24, 2002, to the present -- who were age 65 or older at the time of purchase.

> California Senior Sub-Class: All California residents who purchased one or more Jackson National Life Insurance Company deferred annuities (excluding variable annuities) -- from October 24, 2002, to the present -- who were age 65 or older at the time of purchase.

The Court designates Plaintiff Janice Kennedy as class representative and appoints Ingrid M. Evans of Waters Kraus & Paul and Howard D. Finkelstein and Mark L. Knutson of Finkelstein & Krinsk LLP as class counsel.

To the extent that the Court relied upon evidence to which Plaintiff objected, the objections are overruled. (Docket No. 198.) The Court did not rely on any inadmissible evidence in reaching its decision. To the extent the Court did not rely on evidence to which the Plaintiff objected, the objections are overruled as moot.

The Court GRANTS Defendant's administrative motion for leave to file a surreply (Docket No. 201), GRANTS in part and DENIES in part its request to have its motions to strike and motion for summary judgment decided concurrently with Plaintiff's class certification motion (Docket No. 229), and DENIES Defendant's motions to strike the reports and testimony of Steven R. Grenadier (Docket No. 227) and Jeffrey Dellinger (Docket No. 225).

28

1    A hearing on Defendant's motion for summary judgment and a

2 further case management conference are scheduled for August 5, 2010

3 at 2:00 p.m.

4    IT IS SO ORDERED.

5

6 Dated: June 23, 2010

7                                          CLAUDIA WILKEN
                                          United States District Judge

8

9

10