1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9    JANICE KENNEDY, individually, and on        No. C 07-0371 CW
     behalf of herself and all others
10   similarly situated,                          ORDER GRANTING
                                                  PLAINTIFF'S MOTION
11            Plaintiff,                           FOR LEAVE TO
                                                  SUPPLEMENT THE
12       v.                                        EVIDENTIARY RECORD
                                                  (Docket No. 265),
13   JACKSON NATIONAL LIFE INSURANCE              GRANTING DEFENDANT'S
     COMPANY,                                     MOTION FOR SUMMARY
14                                                JUDGMENT (Docket No.
              Defendant.                          217), AND DENYING AS
15   _____/    MOOT DEFENDANT'S AND
                                                  PLAINTIFF'S MOTIONS
16                                                FOR RELIEF FROM NON-
                                                  DISPOSITIVE PRETRIAL
17                                                ORDERS OF MAGISTRATE
                                                  JUDGE (Docket Nos.
18                                                278 and 282)

19        Defendant Jackson National Life Insurance Company moves for

20   summary judgment on Plaintiff Janice Kennedy's claims.  Plaintiff

21   opposes the motion.  The motion was heard on August 5, 2010.

22        The parties have filed three additional motions, which were

23   submitted after the hearing on summary judgment.  First, Plaintiff

24   seeks leave to supplement the evidentiary record.  Defendant

25   opposes Plaintiff's motion.  Second, Defendant requests relief from

26   the September 7, 2010 Order of Magistrate Judge Maria-Elena James,

27   which denied Defendant's motion to compel concerning testimony by

28   one of Plaintiff's experts.  Finally, Plaintiff requests relief

from the September 21, 2010 Order of Judge James, which denied Plaintiff's motion to compel the production of documents.

Having considered oral argument and the papers submitted by the parties, the Court GRANTS Plaintiff's administrative motion for leave to supplement the record, GRANTS Defendant's motion for summary judgment and DENIES as moot Defendant's and Plaintiff's motions for relief from Judge James's orders.

BACKGROUND

I.   Facts

Plaintiff brings this action on behalf of herself and other similarly situated individuals. She alleges that Defendant engaged in unlawful practices in the solicitation, offering and sale of fixed deferred annuity products to senior citizens.

An annuity is a contract between an annuitant and an insurance company, under which the insurance company agrees to credit interest on a premium paid by the annuitant. Dellinger Decl. ¶ 18. The insurance company has discretion, subject to a contractually guaranteed minimum, in setting the rate at which it credits interest. The insurance company may reset this rate periodically. Because interest is paid daily, the annuitant's account value increases over time. In a deferred annuity, the annuitant forgoes payments from the account for a preset term.

Defendant markets its fixed deferred annuities through "independent agents, independent and regional broker/dealers, and through financial institutions such as banks, thrifts and credit units." Evans Decl., Ex. LL at JNLK0032988. Jackson National Life Distributors (JNLD), a subsidiary of Defendant, "is responsible for marketing arrangements with and providing marketing support to

2

independent insurance agents and independent broker-dealers."

Evans Decl., Ex. OO at JNLK0018021.  The Institutional Marketing

Group (IMG), a unit of JNLD, works with financial institutions to

market Defendant's annuities to those institutions' customers.

In its opposition to Plaintiff's motion for class

certification, Defendant explained that it has divided its sales

force into four separate "channels":

    i. Independent channel: self-employed representatives who
operate and pay the costs associated with their offices
and operations.

    ii. Bank channel: representatives housed in financial
institutions like banks and credit unions; they are often
employees of those institutions and often subject to
unique policies and procedures regarding, among other
things, the marketing materials they are permitted to
use.

    iii. Regional broker/dealer channel: representatives
associated with a regional broker/dealer and subject to
the institutions' unique policies and procedures
regarding, among other things, the marketing materials
they are permitted to use.

    iv. Wirehouse channel: representatives associated with a
national broker/dealer and subject to the institutions'
unique policies and procedures regarding, among other
things, the marketing materials they are permitted to
use.

Def.'s Opp'n to Pl.'s Mot. for Class Certification at 6.

Defendant's independent sales representatives are required to

sign a "producer agreement."  Evans Decl., Ex. TT at JNLK0018141.

Under this agreement, sales representatives affirm that they will

comply with Defendant's policies.  For instance, although sales

representatives are not required to distribute a uniform set of

brochures to potential clients, they may only "use Company-approved

advertising and sales material."  Id. at JNLK0018142.  Defendant

does not preclude its sales representatives from selling the

United States District Court
For the Northern District of California

annuities of other companies.

On or about January 27, 2004, Plaintiff purchased one of Defendant's JNL Bonus Max Two deferred annuities through Peter Spafford, who was an independent sales representative for Defendant.  Plaintiff paid $100,000 for the annuity, for which Spafford received an $8,000 commission.  Spafford's commission was not disclosed to Plaintiff.

Plaintiff's contract provided an initial interest rate "bonus" of 0.25 percent, which resulted in the payment of interest at a rate of 3.35 percent for the first year.  Although the interest rate could vary thereafter, the contract guaranteed a minimum rate of 2.25 percent for the first ten years Plaintiff held the annuity. The contract stated, in bold print on the front page,

> THIS CONTRACT HAS A BONUS INTEREST RATE.  ALL PREMIUM PAID INTO THE CONTRACT WILL RECEIVE AN INTEREST RATE BONUS FOR ONE YEAR FROM THE DATE IT WAS RECEIVED.  AFTER THE BONUS YEAR, INTEREST WILL BE CREDITED AT THE CURRENT RATE BY THE COMPANY'S BOARD OF DIRECTORS.  AS A RESULT OF THE BONUS RATE, RATES IN SUBSEQUENT YEARS WILL BE LOWER THAN THAT CREDITED ON NON-BONUS CONTRACTS.

Fee Decl., Ex. 5 at KENNEDY000738.

The contract also disclosed that Plaintiff would incur a withdrawal, or surrender, charge if, in a given calendar year, she withdrew more than fifteen percent of the annuity's "accumulated value."[1]  However, any withdrawal that did not cause this fifteen-percent annual limit to be exceeded was considered free and did not trigger a charge.

_____

[1] The contract defined accumulated value as an "amount equal to the Premium(s) and any subsequent amounts credited to the Contract, including interest credited, less any amounts withdrawn, less any taxes and Withdrawal Charges previously assessed."  Fee Decl., Ex. 5 at KENNEDY000742.

United States District Court
For the Northern District of California

4

United States District Court
For the Northern District of California

The amount of a withdrawal charge was based on a rate schedule disclosed in the contract.  For instance, if funds were withdrawn within one year of the initial premium payment, a withdrawal charge of nine percent of the premium and the interest paid thereon would be assessed.  This charge decreased one percentage point per year so that, after nine years, no surrender charge would be assessed on withdrawals.  The contract stated, in bold print on the front page, "AFTER 30 DAYS, CANCELLATION MAY RESULT IN A SUBSTANTIAL PENALTY, KNOWN AS A WITHDRAWAL CHARGE."  Fee Decl., Ex. 5 at KENNEDY000738.

The contract also provided that "an Excess Interest Adjustment may apply to amounts withdrawn from the Contract."  Fee Decl., Ex. 5 at KENNEDY000741.  Like the withdrawal charges described above, the Excess Interest Adjustment (MVA/EIA)[2] operated only if Plaintiff withdrew more than fifteen percent of the annuity's accumulated value in a given calendar year.  The contract defined the MVA/EIA as an "adjustment applied, with certain exceptions, to amounts withdrawn from the Contract, prior to the end of the Withdrawal Charge period."  Id. at KENNEDY000742.  The contract explained, "Withdrawals within the Contract's Withdrawal Charge period will be adjusted downward when interest rates are rising, and upward when they are falling, to reflect the changes in the interest crediting rate since the Premium was credited to the Contract."  Id. at KENNEDY000747.  Notwithstanding the MVA/EIA, the contract provided that in "no event will the Withdrawal Value be less than the Premium payment accumulated at the Minimum Guaranteed

_____

[2] Plaintiff refers to this feature as a "market value adjustment," whereas Defendant terms it an "excess interest adjustment."  Consistent with its order granting Plaintiff's motion for class certification, the Court refers to it as the MVA/EIA.

Interest Rate less any applicable Withdrawal Charge." Id.

The MVA/EIA was determined through the following formula:

$$[(1 + I)/(1 + J + 0.005)]^{N/12}$$

where:

I = the index rate applicable on the date of the payment premium

J = the index rate applicable at the date of withdrawal

N = the number of months between the date of withdrawal and the end of the Withdrawal Charge period.

Fee Decl., Ex. 5 at KENNEDY000748. The formula was subject to the following conditions:

1. In the special case where I = J, the Excess Interest Adjustment factor is set equal to 1; and

2. In the special case where J is less than I, and they differ by less than .5% the Excess Interest Adjustment factor is set equal to 1; and

3. The Excess Interest Adjustment factor shall never be less than the Premium payment adjusted for any prior withdrawals accumulated at the Minimum Guaranteed Interest Rate divided by the Accumulated Value.

Id. The contract stated, in bold print on the front page, "THE ACCUMULATED VALUE IS SUBJECT TO AN EXCESS INTEREST ADJUSTMENT WHICH MAY INCREASE OR DECREASE AMOUNTS PAYABLE OR WITHDRAWN. THE WITHDRAWAL VALUE WILL NEVER DECREASE TO LESS THAN THE MINIMUM AMOUNT GUARANTEED UNDER THE CONTRACT." Id. at KENNEDY000738.

Over the life of her annuity, Plaintiff made three withdrawals. On November 12, 2004, she made a partial withdrawal of $15,000. Before the withdrawal, the annuity had an accumulated value of $102,634.07, which included the interest Defendant had credited to Plaintiff's initial premium. The withdrawal reduced the accumulated value to $87,634.07; no withdrawal charges were assessed because she had not exceeded the fifteen-percent

United States District Court
For the Northern District of California

threshold.   On January 28, 2005, Plaintiff made a partial withdrawal of $13,236.81, which reduced the accumulated value to $75,008.56.   Finally, on April 8, 2005, Plaintiff requested a full withdrawal.   Defendant issued her a check for $68,565.57, which reflected deductions for withdrawal charges of $6,035.95 and a MVA/EIA of -$847.53.

In this action, Plaintiff complains that Defendant did not disclose its sales representatives' commissions, the effects of these commissions on annuity performance and the purported "bias" contained in the MVA/EIA.   She also maintains that Defendant made an affirmative misrepresentation or provided an inadequate disclosure with regard to the interest rate bonus associated with her annuity.

At her deposition, Plaintiff testified that, when she purchased her first JNL Bonus Max Two from Spafford in 2002, she believed that he suggested one of Defendant's annuities "out of the goodness of his heart" and because he had her "best interests in mind."   Evans Decl., Ex. L 156:15-18.   She then stated, "In 2004, if I had known he was making a very, very large commission, I think I may have hesitated when he said it's another Jackson National Life product, but it's different than the one you were in.   I think I might have questioned it."   Id. at 156:20-24. Later in her deposition, she stated that, if Spafford were to receive $10,000 for her $100,000 investment, "that's a good amount of money for a couple hours' work."   Evans Decl., Ex. L at 163:19-25.   There is no evidence in the record before the Court that Plaintiff offered any testimony regarding the MVA/EIA or the bonus.

Jeffrey K. Dellinger, one of Plaintiff's experts, asserted

United States District Court

For the Northern District of California

that sales representative commissions constitute the bulk of "acquisition expenses" paid by Defendant.  Dellinger Decl. ¶ 27. He opined that these expenses adversely affect annuity performance because they reduce the assets Defendant has available to invest on behalf of the annuitant, which affects "the ability of Jackson National to credit interest to Deferred Annuity accounts."  Id. ¶ 39.  In particular, Dellinger maintained that, to stay profitable, Defendant must "introduce a larger spread" between the rate it earns on the investments that underlie its annuities and the rate at which it credits interest on the annuities.  Id.  To achieve a larger spread, Dellinger asserted, Defendant must lower the interest rate on its annuities.

Dellinger also attacked the MVA/EIA, which he maintained contains an undisclosed bias that always works to the detriment of annuitants.  He explained that the MVA/EIA is used to "pass through to contract owners any capital gains or losses realized on disinvestment of underlying securities that are sold to raise cash to meet Deferred Annuity withdrawal or surrender requests." Dellinger Decl. ¶ 55.  Changes in the price of the securities underlying the annuity could generate capital gains or losses.  The bias arises, according to Dellinger, through the 0.005 value included in the denominator of the MVA/EIA formula disclosed in Plaintiff's contract.  This figure, Dellinger asserted, ensures that there will be some "reduction in the dollar amount of withdrawal or surrender paid to the policyholder," irrespective of any change in security prices.  Id. ¶ 60.

Finally, Dellinger asserted that the interest rate bonus associated with Plaintiff's annuity is illusory.  He maintained

8

that any benefit obtained through the higher interest rate for the first year is offset by lower interest rates in subsequent years.

Craig Merrill, Defendant's expert, responded to Dellinger's criticisms. With regard to acquisition expenses, Merrill agreed with the "rather obvious logic" that higher costs generally lead to lower earnings. Merrill Report at 6. However, he asserted that the disclosure of commissions and other acquisition expenses was not required because these costs "are already 'baked into' the terms of the contract." Id. at 8. Merrill pointed to the interest rates that were disclosed, which he maintained account for these costs. He stated that "all the information needed to evaluate these annuities vis-à-vis competing annuities with similar characteristics is incorporated in the initial crediting rate. Higher (lower) acquisition costs will imply lower (higher) initial crediting rates." Id. at 12.

Merrill likewise contested Dellinger's characterization of the MVA/EIA, asserting that it does not contain a bias, but rather "creates equity between Jackson policyholders." Merrill Report at 15. He explained that the MVA/EIA "protects persisting policyholders from the market risk exposure that . . . is occasioned by the need to liquidate a portion of the supporting bond portfolio at a potential loss in order to honor withdrawal requests." Id., App'x A at 3.

Finally, Merrill asserted that the initial interest rate bonus attached to some of Defendant's annuities, including Plaintiff's, is not illusory. He contended that the "bonus 'locks in' a portion of the ultimate accumulation value that is no longer subject to periodic changes in future crediting rates." Merrill Report at 9.

United States District Court
For the Northern District of California

He noted that annuitants could realize the effect of the bonus through making a penalty-free withdrawal.  For instance, during the first year, "the same percentage withdrawal will provide more dollars from a bonus annuity than from a non-bonus annuity."  Id. at 12.

III. Plaintiff's Complaint and Procedural History

Plaintiff's operative complaint contains seven claims: (1) violations of the Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c)-(d); (2) financial elder abuse, in violation of California Welfare and Institutions Code §§ 15600, et seq.; (3) violation of California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200; (4) violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17500; (5) fraudulent concealment, in violation of California Civil Code § 1710; (6) fraudulent inducement and misrepresentation; and (7) common law fraud.

On June 23, 2010, the Court certified the following classes:

Nation-wide RICO Senior Class: All persons who purchased one or more Jackson National Life Insurance Company deferred annuities (excluding variable annuities) -- from October 24, 2002, to the present -- who were age 65 or older at the time of purchase.

California Senior Sub-Class: All California residents who purchased one or more Jackson National Life Insurance Company deferred annuities (excluding variable annuities) -- from October 24, 2002, to the present -- who were age 65 or older at the time of purchase.

The California Senior Sub-Class was certified to prosecute only the claims for financial elder abuse and violations of the UCL and the False Advertising Law.

In her class certification motion, Plaintiff did not establish that each class member received a uniform set of Defendant's

printed marketing materials or that its sales representatives each offered an identical sales pitch.  However, there was evidence that Defendant did not disclose, to class members, its commissions, their effects and the alleged bias contained in the MVA/EIA.  There was also undisputed evidence that Defendant represented that some of its annuities, such as the one purchased by Plaintiff, had an interest rate bonus.  Consequently, the Court certified the class. The Ninth Circuit denied Defendant's petition for interlocutory review of the Court's class certification order.

LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute.  Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289.  The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the

11

United States District Court

For the Northern District of California

outcome of the case.  The substantive law will identify which facts are material.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods:

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

<u>Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.</u>, 210 F.3d 1099, 1106 (9th Cir. 2000).

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim.  <u>Id.</u>; <u>see also</u> <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 885 (1990); <u>Bhan v. NME Hosps., Inc.</u>, 929 F.2d 1404, 1409 (9th Cir. 1991).  If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists."  <u>Bhan</u>, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation.  <u>Nissan</u>, 210 F.3d at 1105.  If the moving party produces such evidence, the

United States District Court
For the Northern District of California

1    burden then shifts to the non-moving party to produce specific

2    evidence to show that a dispute of material fact exists.   <u>Id.</u>

3        If the moving party does not meet its initial burden of

4    production by either method, the non-moving party is under no

5    obligation to offer any evidence in support of its opposition.   <u>Id.</u>

6    This is true even though the non-moving party bears the ultimate

7    burden of persuasion at trial.   <u>Id.</u> at 1107.

8                             DISCUSSION

9    I.   RICO Claims

10       To prevail on a claim under 18 U.S.C. § 1962(c), a plaintiff

11   must prove "(1) conduct (2) of an enterprise (3) through a pattern

12   (4) of racketeering activity (known as predicate acts) (5) causing

13   injury to plaintiff's business or property."   <u>Living Designs, Inc.</u>

14   <u>v. E.I. Dupont de Nemours & Co.</u>, 431 F.3d 353, 361 (9th Cir. 2005)

15   (citation and internal quotation marks omitted).

16       The racketeering activities upon which Plaintiff relies are

17   the federal offenses of wire fraud and mail fraud.   "A wire fraud

18   violation consists of (1) the formation of a scheme or artifice to

19   defraud; (2) use of the United States wires or causing a use of the

20   United States wires in furtherance of the scheme; and (3) specific

21   intent to deceive or defraud."   <u>Odom v. Microsoft Corp.</u>, 486 F.3d

22   541, 554 (9th Cir. 2008) (internal quotation marks omitted); 18

23   U.S.C. § 1343.   Mail fraud differs only in that it involves the use

24   of the United States mails rather than wires.   <u>See</u> 18 U.S.C.

25   § 1341.

26       The wire and mail fraud statutes apply to non-disclosures, as

27   well as to affirmative misrepresentations.   <u>United States v. Benny</u>,

28   786 F.2d 1410, 1418 (9th Cir. 1986).   A "non-disclosure can only

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

serve as a basis for a fraudulent scheme when there exists an independent duty that has been breached by the person so charged." Id. (quoting United States v. Dowling, 739 F.2d 1445, 1449 (9th Cir. 1984), rev'd on other grounds, 473 U.S. 207 (1985)). "This independent duty may exist in the form of a fiduciary duty to third parties, or may derive from an independent explicit statutory duty created by legislative enactment." Benny, 786 F.2d at 1418 (citations omitted).[3]  A duty may also arise if a defendant presents a half-truth that requires the disclosure of information to prevent the earlier statement from being misleading. See United States v. Woods, 335 F.3d 993, 998 (9th Cir. 2003).

As explained below, Plaintiff fails to create a triable issue as to whether Defendant engaged in a pattern of racketeering activity.  In particular, the evidence does not suggest that Defendant engaged in a scheme to defraud and had a specific intent to defraud.  Accordingly, summary judgment is warranted on Plaintiff's § 1962(c) claim and her claim under 18 U.S.C. § 1962(d), which proscribes conspiracies to commit RICO violations.

A.    Scheme to Defraud

1.    Non-disclosure of Commissions and Their Effects on Performance of Plaintiff's Annuity

Defendant argues that it cannot be held liable for failing to

_____

[3] Plaintiff cites Emery v. American General Finance, Inc., for the principle that "omissions or concealment of material information can constitute fraud, cognizable under the mail fraud statute, without proof of a duty to disclose the information pursuant to a specific statute or regulation."  71 F.3d 1343, 1346-47 (7th Cir. 1995) (alteration marks omitted).  This is not inconsistent with Ninth Circuit precedent.  As noted above, a fiduciary relationship can impose a duty to disclose material information.  In addition, the dissemination of a half-truth could impose a duty to disclose information necessary to prevent the earlier statement from being misleading.

United States District Court
For the Northern District of California

disclose its independent sales representatives' commissions because it had no duty to do so.  Plaintiff does not argue that she had a fiduciary relationship with Defendant that required the disclosure of material information.  Thus, Defendant may be held liable for the non-disclosure of its commissions and their effects only if Plaintiff can demonstrate that it had an explicit statutory duty to disclose such information or that the information presented by Defendant constituted a half-truth.

Plaintiff cites <u>Migliaccio v. Midland National Life Insurance Company</u>, 2007 WL 316873 (C.D. Cal.), and <u>Negrete v. Allianz Life Insurance Company of North America</u>, 238 F.R.D. 482 (C.D. Cal. 2006), to argue that courts have not held that, as a matter of law, insurers, such as Defendant, have no duty to disclose commissions. However, neither case held that insurers do have such a duty, nor did they squarely address any source of such a duty.  The <u>Migliaccio</u> court denied the defendant's motion to dismiss, concluding that the plaintiffs sufficiently alleged their fraud claims regarding the defendant's non-disclosure of its commissions. 2007 WL 316873, at *6.  The court noted the defendant's argument that it did not have a duty to disclose commissions and the plaintiffs' contention that the California Insurance Code imposes a statutory duty of honesty, good faith and fair dealing; the court, however, did not provide any explicit analysis as to how the Insurance Code supported the plaintiffs' claims.  <u>Negrete</u> certified a class to prosecute claims based on the failure to disclose commissions, but did not address the duty question.

Plaintiff has not clearly identified a statutory duty to disclose commissions and their effects, mentioning only the duty of

United States District Court
For the Northern District of California

honesty in the California Insurance Code.

In California, annuities are regulated under the Insurance Code, as a type of life insurance. Cal. Ins. Code § 101. Two statutes appear to relate to Plaintiff's claims. California Insurance Code section 785(a) provides, "All insurers, brokers, agents, and others engaged in the transaction of insurance owe a prospective insured who is 65 years of age or older, a duty of honesty, good faith, and fair dealing." No court has addressed what section 785(a) requires insurance companies to disclose with respect to annuities. However, the plain language of the statute does not mandate disclosure of commissions and their effects. Plaintiff does not offer authority requiring a contrary conclusion.

Insurance Code section 332 states, "Each party to a contract of insurance shall communicate to the other, in good faith, all facts within his knowledge which are or which he believes to be material to the contract and as to which he makes no warranty, and which the other has not the means of ascertaining." Materiality is to be determined "solely by the probable and reasonable influence of the facts upon the party to whom the communication is due, in forming his estimate of the disadvantages of the proposed contract, or in making his inquiries." Cal. Ins. Code § 334. Generally, section 332 applies when an insurer seeks to rescind an insurance policy based on an insured's failure to disclose material information relevant to coverage. See, e.g., Holz Rubber Co., Inc. v. Am. Star Ins. Co., 14 Cal. 3d 45, 61 (1975); Thompson v. Occidental Life Ins. Co., 9 Cal. 3d 904, 916 (1973). However, in Pastoria v. Nationwide Insurance, the state court concluded that the plaintiffs' argument that section 332 supported a "duty to

16

disclose . . . impending amendments to the policies changing premiums and benefits" was "not without merit." 112 Cal. App. 4th 1490, 1496 (2003). The <u>Pastoria</u> court did not go so far as to rule that section 332 in fact supported a duty to disclose the policy changes of which the plaintiffs complained. <u>See</u> <u>id.</u> ("[A]t this point we decline to find that the defendants did not have duty, as a matter of law, to disclose the information about impending policy changes to the plaintiffs before the plaintiffs bought their policies."). Nor did the court delineate the disclosures section 332 requires.

Here, the Court assumes without deciding that section 332 imposes on Defendant a duty to disclose information that would have a "probable and reasonable influence" on prospective purchasers' estimation of the "disadvantages" of annuities. Plaintiff does not provide facts to indicate that Defendant violated such an obligation.

Although Plaintiff testified that she might have hesitated had she known Spafford received a sizeable commission based on her purchase, her testimony does not suggest that the amount of the commission would have influenced her evaluation of the JNL Bonus Max Two. She did not state that a high commission would impugn, in her mind, the quality of Defendant's annuities. Nor did Plaintiff testify that she would not have purchased the annuity had she known of Spafford's commission.

The failure to explain the effects of commissions did not violate the duty to disclose material information. Dellinger contends that the payment of high commissions adversely affects Defendant's "ability" to pay interest because it reduces the amount

United States District Court
For the Northern District of California

Defendant can invest on behalf of annuitants.  But this could be said of any expense Defendant incurs.  Plaintiff's argument, if taken to its logical conclusion, would require disclosure of an insurer's other costs, including the rent paid for its offices and the wages and salary paid to its employees.  These expenses likewise diminished the financial resources Defendant had to invest on behalf of annuitants.  As Merrill stated, the terms of the annuity contract reflect Defendant's costs and other business decisions.  Plaintiff offers no reason to believe that her assessment of her annuity's disadvantages would have been influenced further by an explanation that her contract's terms were impacted by Defendant's costs, including its acquisition expenses, such as commissions.

At the hearing on Defendant's summary judgment motion, Plaintiff posited that Defendant had a duty to disclose commissions because it provided its independent sales representatives with a prepared newspaper advertisement, which stated that the JNL Bonus Max Two has no "front-end loads or annual fees."  Pl's. Supp. to Ex. P at JNLK0037356.[4]  She maintained that this was a half-truth, which imposed a duty of disclosure.  There is no evidence that this advertisement was used by any independent sales representative.  Nor is there evidence that Plaintiff saw the advertisement, let alone that the rest of the class saw it.  Even if there were such evidence, the advertisement is not a half-truth about Defendant's commissions because it does not make any statement about or allusion to those expenses.  Nor does Plaintiff demonstrate that

---

[4] The Court GRANTS Plaintiff's administrative motion to supplement the evidentiary record.  (Docket No. 265.)

18

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

the advertisement is false: there is no evidence that Defendant charged Plaintiff a front-end load or an annual fee.

Plaintiff suggested that Spafford's commission was a front-end load, asserting that a "commission comes directly out of" an annuitant's initial investment.  Tr. of Aug 5. 2010, at 18:8-9. She appeared to argue that, because Defendant paid Spafford an $8,000 commission for Plaintiff's $100,000 annuity, she earned interest on only $92,000 of her initial premium.  See id. at 14:5-7 ("I believe . . . that when you invest, as in the case of Ms. Kennedy, hundred thousand dollars, the actual investment that they book is 92,000 because 8,000 was paid immediately to Mr. Spafford.").  There is no evidentiary basis for this assertion. Plaintiff pointed to Figure 1 of the Merrill Report, arguing that it demonstrates that Defendant only invested $92,000 of Plaintiff's premium.  However, that figure represents an amalgam of charts and assumptions contained in Dellinger's declaration, which Merrill used to refute the claim that acquisition costs must be disclosed.[5] It does not amount to the admission that Plaintiff argued. Referring to the figure, Merrill asserted that it made no difference that Defendant may have invested only $90,000 in securities that were expected to earn five percent annually so long as it disclosed to annuitants that they would earn only 3.78 percent annually on an initial premium of $100,000; the result of the two circumstances is the same.

In essence, Plaintiff's theory is that Defendant had a duty to

_____

[5] Indeed, Merrill's figure assumes that Defendant invested only $90,000 of Plaintiff's premium, not $92,000 as she represented at the hearing.

1  disclose its commissions because, along with other acquisition

2  expenses, they impacted how much Defendant could pay in interest.

3  Although it is true that Defendant's expenses likely had some

4  effect on the rate of interest it decided to pay, the minimum

5  guaranteed interest rate, the rate at which interest would be paid

6  each year and the withdrawal charges were disclosed to prospective

7  purchasers, including Plaintiff.

8       Based on the foregoing facts and disclosures, Defendant's non-

9  disclosure of its commissions and their effects did not amount to a

10 scheme to defraud.

11              2.    Non-Disclosure of Bias in MVA/EIA

12      Defendant asserts that it cannot be held liable for the non-

13 disclosure of the purported bias in the MVA/EIA because the 0.005

14 value that Plaintiff identifies as effecting the bias is disclosed.

15 Plaintiff responds that the value is in an "indecipherable formula"

16 that "provides no meaningful disclosure concerning the mechanics or

17 application of the bias and the effect on surrender values."  Opp'n

18 at 12.  She acknowledges, however, that the 0.005 value is

19 reflected in her contract.

20      Plaintiff offers no authority to support her position that

21 Defendant could be held liable for failing to disclose the effect

22 of the 0.005 value in the MVA/EIA formula.  Defendant did not

23 present a half-truth by failing to explain the 0.005 value.  The

24 lack of an explanation does not make the information about the

25 MVA/EIA misleading.

26      In light of existing disclosures, there is no evidence that

27 further explanation was necessary.  Defendant disclosed that the

28 MVA/EIA could, based on a formula and subject to certain

**United States District Court**
For the Northern District of California

conditions, adjust how much an annuitant receives upon making a withdrawal. Plaintiff complains that Defendant defined the other variables in the MVA/EIA formula, but failed to explain the 0.005 value. This is not fraud. If Defendant had failed to define the variables, it would be impossible to calculate the value of the MVA/EIA, which would have rendered the disclosure of the formula meaningless. The same cannot be said about the failure to explain the structure of the formula or the other values contained in it, such as the 0.005 value. Even without such an explanation, the adjustment to a withdrawal caused by the MVA/EIA can be determined. Thus, Defendant did not engage in a scheme to defraud by failing to disclose the effect of the 0.005 value in its MVA/EIA formula.

For this reason, Plaintiff's MVA/EIA bias theory does not support her claims or those of the class. With respect to her individual claims, in addition, Plaintiff fails to show that it caused her alleged injury. See Holmes v. Secs. Investor Protection Corp., 503 U.S. 258, 268 (1992) (requiring a RICO plaintiff to establish proximate causation). Lisa Drake, Defendant's chief actuary, demonstrated that, with or without the 0.005 value, Plaintiff's withdrawal would have been adjusted downward by the same amount. Fee Decl., Ex. 1 ¶¶ 6-7. She explained that, because of the guaranteed minimum interest rate contained in Plaintiff's contract, the MVA/EIA could not reduce Plaintiff's withdrawal by more than $847.53.[6] At the hearing on Defendant's summary judgment

---

[6] Without the guaranteed minimum interest rate, the MVA/EIA on Plaintiff's withdrawal would have been -$3,791.34. Fee Decl., Ex. 1 ¶ 8(A). If the 0.005 value were taken out of the formula, the MVA/EIA would have been -$1,290.39. Id. ¶ 8(B). However, as Drake (continued...)

United States District Court
For the Northern District of California

motion, Plaintiff argued that the $847.53 nevertheless reflected the bias, stating that "$657.68 of that $847 that she was charged . . . was strictly and entirely and solely due to the undisclosed bias." Tr. of Aug. 5, 2010 at 26:25-27:3. It is not apparent how Plaintiff calculated the $657.68 amount. Further, there is no evidence that the $847.53 was solely attributable to the undisclosed bias. As Drake's calculations demonstrated, the $847.53 adjustment could be similarly characterized as the result of the portion of the MVA/EIA formula not attributed to the purported bias.

Based on the foregoing facts and disclosures, Plaintiff does not raise a reasonable inference that Defendant engaged in a scheme to defraud due to the alleged bias contained in the MVA/EIA.

> 3. Misrepresentation or Inadequate Disclosure Concerning Interest Rate Bonus

Finally, Defendant maintains that it cannot be held liable for representing that some of its annuities have an interest rate bonus because it discloses, in bold print and on the front page of its bonus annuity contracts, that the interest rate on bonus annuities in subsequent years will be lower than the interest rate on non-bonus annuities. Plaintiff acknowledges this disclosure, but asserts that it is either false or, at best, a half-truth. She maintains that the bonus was illusory because any benefit obtained through the higher initial interest rate would be recouped through "internal product pricing." Opp'n at 13.

Because Plaintiff did not demonstrate that any of Defendant's

[6](...continued)
explained, and Plaintiff does not dispute, the rate guarantee limited the MVA/EIA to -$847.53.

22

United States District Court
For the Northern District of California

marketing materials were uniformly distributed to and viewed by the class, her case rests on the meaning of the word "bonus" and her argument that its use in connection with her annuity constituted an affirmative misrepresentation or an inadequate disclosure.[7]  Bonus is defined to mean "something given or received that is over and above what is expected" or "a premium . . . given by a corporation to a purchaser of its securities."  <u>Webster's 3d New Int'l Dictionary</u> 252 (1993).  There is no evidence that Plaintiff understood the word differently, or misunderstood the bonus associated with her annuity.

Here, Plaintiff's JNL Bonus Max Two provided a higher interest rate during its first year, as compared to non-bonus annuities. Because of this initial interest rate bonus, a free withdrawal of a certain percentage of a bonus annuity would result in a larger dollar amount than a withdrawal of an identical percentage of a non-bonus annuity of equal size.  Based on these facts, it is not false that Defendant's annuities with a higher initial interest rate have a bonus.

Nor is it a half-truth in light of Defendant's disclosures. As noted above, Plaintiff's contract disclosed that the interest rate bonus would apply for only one year and that the interest rate, in subsequent years, "will be lower than that credited on non-bonus contracts."  Fee Decl., Ex. 5 at KENNEDY000738.  These

---

[7] Plaintiff refers to a flyer about an Action Two annuity, which states that the interest rate bonus acts as a "boost to accumulation values over the years."  Opp'n at 13 (quoting Evans Decl., Ex. Q, JNLK0000904).  However, Plaintiff did not buy an Action Two annuity, and there is no evidence that she saw this flyer or that Defendant provided it to all class members and, therefore, it cannot support her claim or class-wide liability.

statements explain the extent of the initial interest rate bonus and its effect on future interest rates.

At least two other district courts have rejected claims of fraud concerning an annuity with an interest rate bonus and a similar disclosure. In <u>Phillips v. American International Group, Inc.</u>, the plaintiff alleged that

> the Annuity Contracts made misleading partial disclosures when they represented that plaintiff would receive "bonus" rates of interest in the first years of the Annuity Contracts, but failed to disclose that these "bonus" rates could "not be permanently realized" by plaintiff, as a result of which plaintiff received "substantially less" interest than the Annuity Contracts, by their use of the term "bonus," represented to plaintiff.

498 F. Supp. 2d 690, 697 (S.D.N.Y. 2007) (citations omitted). The court found that the annuity contracts at issue disclosed "that the bonus rates apply in the first years only, that the base rates may change in subsequent years, and that defendants retained sole discretion to determine the rates in subsequent years, subject to a minimum rate." <u>Id.</u> Based on this finding, the court concluded that "the fact that the Annuity Contracts did not disclose that the bonus rate of interest could not be permanently realized does not rise to the level of fraud." <u>Id.</u>

In rendering its decision, the <u>Phillips</u> court relied on <u>Delaney v. American Express Co.</u>, in which the plaintiffs similarly alleged that "Defendants misrepresented that the 'annuity had a bonus interest rate to be paid in year one, and Plaintiffs [] would permanently realize the full benefit of the guaranteed bonus.'" 2007 WL 1420766, at *5 (D.N.J.) (citation omitted; alteration in original). On a motion to dismiss, the <u>Delaney</u> court rejected the plaintiffs' fraud claim, finding that "the Annuity Documents make

24

United States District Court
For the Northern District of California

perfectly clear that (1) the bonus rate applies to the first year only, (2) the base rate may change in subsequent years, and (3) Defendants retained sole discretion to determine the rate in subsequent years, subject to a contractually guaranteed minimum rate." Id. at *6.

Plaintiff's theory of fraud and Defendant's disclosure are similar to those in Phillips and Delaney. Indeed, to the extent that Defendant's disclosure is different, it offers more information: unlike the Phillips and Delaney disclosures, Defendant's revealed that, because of the initial interest rate bonus, the interest rates in subsequent years would be lower. Plaintiff does not offer evidence that Defendant or its sales representatives affirmatively obscured or misrepresented the disclosure -- printed in bold, capital letters -- on her contract. Nor, as noted above, did she testify that she did not understand the operation of the initial interest rate bonus. Further, Plaintiff does not persuasively challenge the conclusions of the Phillips and Delaney courts.

This case is distinguishable from Mooney v. Allianz Life Insurance Company of North America, 2009 WL 511572 (D. Minn.), in which there was a genuine issue of material fact as to whether a so-called bonus was misleading. There, the court found that the defendant provided, on a class-wide basis, brochures indicating that the bonus associated with its annuities was "up-front" and "immediate." Id. at *2. One plaintiff testified that the language in the brochure explaining the bonus was "very confusing." Id. Another plaintiff stated that she thought the brochure was misleading. Id. Here, however, Plaintiff does not offer

individual or class-wide proof regarding marketing materials, and her theory of liability is limited to fraud based on the use of the word "bonus." There is no evidence that Defendant made any other representations about the interest rate bonus to Plaintiff or to all class members. Further, unlike the <u>Mooney</u> plaintiffs, Plaintiff does not represent that she was confused by her contract's language concerning the bonus.

Based on the foregoing facts and disclosures, Defendant did not engage in a scheme to defraud by using the word "bonus" in connection with Plaintiff's annuity.

Plaintiff does not create a triable issue on any of her fraud theories. Accordingly, her RICO claims fail because she does not raise a reasonable inference that Defendant engaged in racketeering activity.

B.   Specific Intent to Defraud

Under the federal mail and wire fraud statutes, "intent to defraud may be inferred from circumstantial evidence." <u>United States v. Sullivan</u>, 522 F.3d 967, 974 (9th Cir. 2008) (citation and internal quotation marks omitted). The "scheme itself may be probative circumstantial evidence of an intent to defraud." <u>Id.</u> (citations omitted).

To demonstrate that Defendant had a specific intent to defraud, Plaintiff refers to the same evidence she used to support her fraud theories. However, this evidence does not create a genuine material dispute as to whether Defendant engaged in a scheme to defraud, let alone that it harbored a specific intent to defraud. Plaintiff does not show that Defendant attempted to conceal its commissions. Further, she does not explain how

1  Defendant intended to defraud seniors about the MVA/EIA and the

2  initial interest rate bonus, notwithstanding its disclosure of

3  these features.

4      Plaintiff offers neither direct nor circumstantial evidence of

5  Defendant's specific intent to defraud.  Thus, for this additional

6  reason, Plaintiff fails to create a triable issue as to whether

7  Defendant engaged in racketeering activity, and summary judgment is

8  warranted on her RICO claims.

9  II.  State Law Claims

10     Like her federal RICO claims, Plaintiff's state law claims are

11 based on her allegations that she suffered injury based on the

12 aforementioned theories of fraud.

13     A.   Claims under California's Unfair Competition Law

14     California's Unfair Competition Law (UCL) prohibits any

15 "unlawful, unfair or fraudulent business act or practice."  Cal.

16 Bus. & Prof. Code § 17200.  Section 17500 of the Business and

17 Professions Code prohibits "any unlawful, unfair or fraudulent

18 business act or practice and unfair, deceptive, untrue or

19 misleading advertising."

20     The UCL incorporates other laws and treats violations of those

21 laws as unlawful business practices independently actionable under

22 state law.  Chabner v. United Omaha Life Ins. Co., 225 F.3d 1042,

23 1048 (9th Cir. 2000).  Violation of almost any federal, state or

24 local law may serve as the basis for a UCL claim.  Saunders v.

25 Superior Court, 27 Cal. App. 4th 832, 838-39 (1994).  In addition,

26 a business practice may be "unfair or fraudulent in violation of

27 the UCL even if the practice does not violate any law."  Olszewski

28 v. Scripps Health, 30 Cal. 4th 798, 827 (2003).

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

Actions under sections 17200 and 17500 are "equitable in nature; damages cannot be recovered." Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1144 (2003). Plaintiffs "are generally limited to injunctive relief and restitution." Id. (citation and internal quotation marks omitted).

Plaintiff must demonstrate that she has standing to assert claims under sections 17200 and 17500. See Cal. Bus. & Prof. Code §§ 17203-04 and 17535. To do so, she must show that she "suffered an injury in fact" and "lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204. Plaintiff asserts that she lost money because she paid a surrender charge, her withdrawal was adjusted based on the MVA/EIA and she "unknowingly funded the undisclosed 8% ($8,000) commission on her total premium." Opp'n at 22. However, only the first two of these purported losses could support her standing to bring a UCL claim. There is no evidence that Plaintiff paid the sales commission of which she complains.

Plaintiff's surrender charge and the adjustment based on the MVA/EIA formula were not the result of unfair competition. Both the surrender charge and the MVA/EIA were disclosed in her contract. And for the reasons stated above, Defendant did not engage in any fraud or violate the RICO Act when it sold her the JNL Bonus Max Two annuity. Thus, she lacks standing to bring UCL claims arising from the surrender charge and adjustment based on the MVA/EIA formula.

Plaintiff notes that section 17500 prohibits "'not only advertising which is false, but also advertising which, although true, is either actually misleading or which has a capacity,

likelihood or tendency to deceive or confuse the public.'" Williams v. Gerber Prods. Co., 552 F.3d 934, 938 (9th Cir. 2008) (quoting Kasky v. Nike, Inc., 27 Cal. 4th 939, 950 (2002)). However, even if she had standing to bring her section 17500 claim, it would nevertheless fail. She does not identify any advertising materials that were viewed by herself or all class members. And, because of Defendant's disclosures, the portions of Plaintiff's contract concerning the interest rate bonus and the MVA/EIA were not misleading and did not have a capacity, likelihood or tendency to deceive or confuse senior citizens.[8]

Accordingly, summary judgment is warranted on Plaintiff's section 17200 and 17500 claims.

B.    Elder Abuse Claim

California law proscribes financial abuse of an elder, which occurs when a "person or entity . . . [t]akes, secretes, appropriates, obtains, or retains . . . personal property of an elder . . . with intent to defraud." Cal. Welf. & Inst. Code § 15610.30.

As noted above, Plaintiff does not raise a reasonable inference that Defendant acted with an intent to defraud. Accordingly, for the reasons stated above, summary judgment is warranted on Plaintiff's elder abuse claim.

C.    Claims for Fraudulent Concealment, Fraudulent Inducement and Representation and Common Law Fraud

Plaintiff did not move to certify a class to prosecute her

---

[8] The Court assumes, without deciding, that the contract was an advertisement as defined by section 17500.

United States District Court
For the Northern District of California

state common law claims. She does not point to any brochure or statement on which she personally relied in making her decision to purchase the JNL Bonus Max Two. Instead, she cites the same evidence she used to support her class claims.[9] See Opp'n at 25.

As already explained, the evidence cited above is not sufficient to support wire or mail fraud. Plaintiff does not argue that her individual common law fraud claims contain elements that would lead to a different result.

Accordingly, summary judgment is warranted on Plaintiff's claims for fraudulent concealment, fraudulent inducement and representation, and common law fraud.

CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiff's motion for leave to supplement the record (Docket No. 265), GRANTS Defendant's Motion for Summary Judgment (Docket No. 217) and DENIES as moot Defendant's and Plaintiff's motions for relief from Judge James's orders (Docket Nos. 278 and 282).

The Clerk shall enter judgment and close the file. Defendant shall recover costs from Plaintiff.

IT IS SO ORDERED.


Dated: 10/6/2010

_____
CLAUDIA WILKEN
United States District Judge

---

[9] As noted above, Plaintiff points to a flyer about an Action Two annuity. However, she did not purchase an Action Two annuity, nor is there any evidence that she relied on this brochure when she decided to buy a JNL Bonus Max Two annuity.

30